## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

)
JAMES A. RALSTON, )
)
Plaintiff, )
)
v. ) Civil Action No. 10-548-GMS
)
MICHAEL J. ASTRUE. )
Commissioner of Social Security, )
)
Defendant. )
_____)

## **MEMORANDUM**

## I. **INTRODUCTION**

The plaintiff James Ralston ("Ralston") filed for disability insurance benefits ("DIB") on October 8, 2007, pursuant to Title II of the Social Security Act. (D.I. 13 at 159-64.) This action against defendant Michael J. Astrue—former commissioner of the Social Security Administration ("SSA")[1]—arises from the denial of Ralston's application. (*Id.* at 101–11.) The SSA denied Ralston's claim initially and on reconsideration. (*Id.*) Ralston thereafter requested an administrative law judge ("ALJ") rehearing. (*Id.* at 112–13.) The hearing took place on October 22, 2008, and June 24, 2009. (*Id.* at 63–95.)

The ALJ, Edward J. Banas, issued a written opinion on July 27, 2009, denying Ralston's DIB claim. (*Id.* at 14–31.) The Appeals Council denied review of the ALJ's decision on May 8, 2010. (*Id.* at 7–13.) Ralston filed a timely appeal with the court on June 22, 2010. (D.I. 2.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 16, 18.) For

---

[1] Carolyn W. Colvin replaced Michael J. Astrue on February 13, 2013, after Sherlock initiated this action. Although, pursuant Federal Rule of Civil Procedure 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this action.

the reasons that follow, the court will: (1) deny the Commissioner's motion for summary judgment; and (2) grant in part Ralston's motion for summary judgment. The court remands this matter for further administrative proceedings.

## II. BACKGROUND

Ralston was born on October 4, 1959. (D.I. 13 at 159.) He has a seventh-grade education. (*Id.* at 218.) As of February 2, 2011, Ralston represented that he is homeless and has been homeless most his life. (*Id.* at 58–61.) At the time of his application for DIB, Ralston was forty-eight years old.

### A. Medical & Employment History

Ralston has primarily worked as an unskilled laborer. (*Id.* at 165–68.) As noted below in greater detail, Ralston has an extensive psychiatric history. (*Id.* at 334–35.) The documentation in support of this history is not in the record. (*Id.* at 334.) Nevertheless, this history appears to include: (1) being hospitalized for psychosis at age thirteen; (2) spending a month in a state hospital for aggression at age seventeen; (3) attempting to commit suicide while incarcerated at age twenty-one; and (4) being hospitalized for and diagnosed with antisocial personality disorder and substance abuse, following a second suicide attempt because he had no place to live or work. (*Id.* at 334–35.)

In March 2003, Ralston was diagnosed with colon cancer and underwent bowel resection surgery. (*Id.* at 247–302.) After surgery, Ralston reported that his bowel function had improved and that he was tolerating a regular diet. (*Id.* at 248.) Although, Ralston was scheduled to continue with post-surgical chemotherapy, he never completed his regimen because of a fear of needles. (*Id.* at 77.) In addition to his colon cancer, Ralston was diagnosed with Hepatitis C, anemia,

2

chronic obstructive pulmonary disease, sinus tachycardia, tobacco use, and a history of intravenous drug abuse. (*Id.* at 247.)

After his surgery, Ralston began to work at a car wash. (*Id.* at 77–78.) Soon thereafter, however, Ralston suffered an injury at work, requiring the traumatic amputation of the tip of his left third finger. (*Id.* at 306–11.) Subsequently, beginning around March 2004, Ralston ceased his employment at the car wash and began living in a tent in the woods. (*Id.* at 59–60, 85.) It was during this time that Ralston began to survive on fish and road-kill deer. (*Id.*)

## B. Expert Opinions

### 1. Physical Opinions

a. *Dr. Lifrak*

Dr. Lifrak, a state agency physician, performed a physical examination of Ralston on July 27, 2005. (D.I. 13 at 330–33.) Ralston's chief complaints were: (1) pain extending from his mid-to lower-back, with accompanying pain and numbness in the left lower extremity; (2) episodes of abdominal discomfort; and (3) Hepatitis. (*Id.* at 330.) Dr. Lifrak found Ralston to exhibit a "mild degree of limp favoring the left lower extremity." (*Id.* at 332.) Overall, he found very few limitations. Dr. Lifrak noted that Ralston was unable to walk on either his heels or toes, but nonetheless did not require an assistive device to walk. (*Id.*) He noted that Ralston was adequately developed and nourished, that he was able to perform maneuvers requiring hand dexterity, and that his grip strength and muscle tone were not limited. (*Id.*)

As for Ralston's range of motion, Dr. Lifrak found reduced motion in the area of the lumbar spine without evidence of muscle spasm. (*Id.* at 333.) Based on the examination and historical information provided, Dr. Lifrak concluded that Ralston—in a typical eight-hour day—would be able to: (1) perform such activities which may require him to walk either outdoors or indoors; (2)

3

climb stairs; (3) sit for a total period of six hours and stand for a period of five to six hours, while taking usual and customary breaks; and (4) lift weight up to ten pounds with either hand on a regular basis. *(Id.)*

### b. *Dr. Borek*

Dr. Borek, a non-examining state agency physician, completed a physical Residual Functional Capacity ("RFC") assessment of Ralston in April 2008. *(Id.* at 353–60.) Dr. Borek concluded that Ralston could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for about six hours in an eight-hour workday; (4) sit for a total of six hours in an eight-hour workday; and (5) perform unlimited pushing and/or pulling. *(Id.* at 354.) Ultimately, Dr. Borek opined that Ralston's medical files did not contain sufficient information to establish a disability prior to March 31, 2006. *(Id.* at 358.)

### 2. Psychiatric Opinions

#### a. *Dr. Chester*

Dr. Chester, a state agency consultative psychologist, examined Ralston on August 16, 2005. (D.I. 13 at 334-37.) Upon arrival, Dr. Chester noted that Ralston looked disheveled and poorly groomed, and that he sat with a slumped posture and walked with a limp. *(Id.* at 336.) Ralston stated, "I have the blues." *(Id.)* Dr. Chester reported that Ralston had no delusion and no disorder of formal thought. *(Id.)*

In her report, Dr. Chester noted that much of the history contained within her report was "gathered from paperwork" sent from the state agency physicians. *(Id.* at 334.) In light of the parties' arguments, the court excerpts a portion of Dr. Chester's summary below:

> The claimant is a 45-year-old single white male. He reports that he has a psychiatric history notable for substance abuse and notable for substance dependence and antisocial personality which dates back to the age of 13 or earlier. At the age of 13 he was admitted to

4

Friends Hospital in Philadelphia and was misdiagnosed with schizophrenia when he presented in a psychotic state. It was later determined that psychosis was secondary to hallucinogens. He was hospitalized at the Delaware State Hospital at the age of 17 and spent one month there. His discharge diagnosis reflected his tendency to be aggressive, a diagnosis that is no longer in use. At the age of 32 he was readmitted to Delaware State Hospital for 24 hours and discharged with diagnosis of substance abuse and antisocial personality disorder. He was admitted because he had had a fight with his employer who was also his landlord. He was accused of sleeping on the job. He left the job precipitously and got intoxicated. He was then left with no place to live or work. In response to that he took an overdose of pills. The discharge summaries . . . note . . . an extensive history of alcohol and substance abuse dating back to the age of 15. His drug of choice was apparently barbiturates and he also used cocaine, marijuana, other hallucinogens, amphetamines, and intravenous heroin. During the interview the claimant only reports use of alcohol and PCP. He reports that he stopped drinking some time in his 30s which is consistent with the paperwork that was sent for review. He denied ever having been treated in a rehabilitation facility or in a detoxification facility. Paperwork sent for review shows that at the age of 29 he was treated as an outpatient in a community mental health center and prescribed amitriptyline. He did not recall this during the interview.

. . . .

There is no history of mania. There is a history of psychosis as previously noted (secondary to substance abuse).

(*Id.* at 334–35.)

Dr. Chester defined Ralston's mood as "euthymic," and that he was alert and oriented. (*Id.* at 336.) Dr. Chester assessed Ralson with a GAF score of 55,[2] indicating moderate limitations and symptoms. (*Id.* at 337.)

---

[2] GAF stands for "Global Assessment of Functioning"; it is a statistical tool used by healthcare providers to measure a person's ability to function. The scale ranges from 1 to 100, in increasing ability to function. A score of 55 indicates: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

## b. *Dr. Fugate*

On January 2, 2008, Dr. Fugate, a non-examining state consultant, reviewed Ralston's health records and completed a psychiatric review technique form and a mental RFC assessment form. (*Id.* at 338–48, 349–51) In his Psychiatric Review Technique Form, Dr. Fugate concluded that Ralston had experienced one or two episodes of decompensation and possessed moderate limitations for: (1) activities of daily living; (2) social functioning; and (3) concentration, persistence, or pace. (*Id.* at 346.) In his mental RFC assessment form, Dr. Fugate concluded Ralston was markedly limited in his ability to interact with others and that Ralston was unable to meet the basic mental demands of simple work. (*Id.* at 351.) Dr. Fugate reported Ralston was moderately or markedly limited in his ability to sustain concentration, interact socially, and adapt. (*Id.* at 349–51.)

## c. *Dr. King*

Dr. King, the state agency's second non-examining psychologist, submitted a Mental RFC Assessment regarding Ralston's alleged disability.[3] (*Id.* at 361-63.) On September 14, 2008, Dr. King opined that Ralston retained the mental RFC for simple, routine work. (*Id.* at 363.) In particular, Dr. King found that Ralston was moderately limited in his ability to sustain concentration and socially interact. (*Id.* at 361–62.)

## d. *Dr. Raclaw*

The ALJ elicited medical expert testimony from non-examining psychologist Dr. Raclaw at the June 24, 2009, hearing. (*Id.* at 36–57.) Dr. Raclaw determined Ralston was not disabled and would be able to return to work. (*Id.* at 38.) The ALJ accepted Dr. Raclaw's testimony over

---

[3] Dr. King also filed a case analysis report on March 29, 2008, affirming Dr. Fugate's January 2, 2008, determination that there was insufficient evidence to determine the severity of any residual limitations as of March 31, 2006—Ralston's last insured date. (*Id.* at 352.)

the objections of Ralston's counsel. (*Id.* at 35–36.) Dr. Raclaw's testimony was primarily based on Ralston's behavior and demeanor during his consultative examinations with Drs. Lifrak and Chester. (*Id.* at 55–56.)

Prior to testifying, Dr. Raclaw was able to examine all of Ralston's records in the administrative record, except for: (1) Ralston's psychiatric history records; (2) Dr. Borek's Physical RFC Assessment; and (3) Dr. King's Mental RFC Assessment. (*Id.* at 35–36.) Dr. Raclaw stated that these records would "add nothing new to the existing data." (*Id.*) First, Dr. Raclaw noted that Ralston suffered from three severe mental impairments applicable at Step Two of the sequential evaluation process: (1) mood disorder (Listing 12.04); (2) antisocial personality disorder (Listing 12.08); and, (3) polysubstance dependence in remission (Listing 12.09). (*Id.* at 37.) Dr. Raclaw determined, however, that at Step Three of the evaluation, Ralston did not meet any of the criteria to be found disabled under the Listing criteria. (*Id.* at 37–38.) Moreover, Dr. Raclaw testified, "[i]t is my considered opinion, based on the evidence I have reviewed, that [Ralston] is capable of making an adjustment to [substantially gainful activity, and that] he's capable of making an adjustment to occupational activity." (*Id.* at 38.)

In coming to his conclusion, Dr. Raclaw assigned little weight to Ralston's own statements about his inability to interact socially. (*Id.* at 45–48.) Rather, Dr. Raclaw primarily relied on Ralston's reported behavior and demeanor during his examinations with Drs. Lifrak and Chester. (*Id.* at 43–45.) Dr. Raclaw admitted that the medical evidence pertaining to the relevant period was sparse but nevertheless attempted to extrapolate the available evidence. (*Id.* at 55.) First, although Ralston lives in the woods and forages for food, Dr. Raclaw determined that Ralston's ability to cook for himself and survive on his own indicates that he is functional. (*Id.* at 42.) Second, Dr. Raclaw heavily weighed Dr. Chester's report that Ralston's mood was cooperative,

euthymic, and polite, and that he possessed good rapport. (*Id.* at 43.) When prompted by Ralston's attorney if cooperation in a clinical setting was transferrable to cooperation in a work situation, Dr. Raclaw responded: "Having little medical evidence to contradict that, I accept that, yes. . . . [I]f you had a hospitalization record that says he was agitated, could not relate to any other human beings, was suspicious of all those around him, I would say, we have to take this comment by Dr. Chester and weigh it against other evidence." (*Id.* at 44.)

## C. The ALJ's Findings

On July 27, 2009, the ALJ found Ralston was not disabled. (*Id.* at 31.) At Step One of the sequential evaluation process, Ralston was found to have engaged in substantial gainful activity from November 2, 2002—the alleged onset date—through February 28, 2004. (*Id.* at 19–20.) The ALJ found, however, that Ralston had not engaged in substantial activity during the period from March 1, 2004, through his last insured date of March 31, 2006. (*Id.*) At Step Two, the ALJ determined Ralston was subject to the following severe impairments: depression, substance abuse disorder, mood disorder, traumatic amputation of the left middle finger, Hepatitis C, degenerative joint disease, and status post right hemicolectomy secondary to a diagnosis of adenocarcinoma of the colon. (*Id.* at 20.) Ralston's alleged antisocial personality disorder was found to be non-severe. (*Id.*) At Step Three, the ALJ determined Ralston was not subject to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.* at 22.) Moreover, despite Ralston's alleged physical and psychiatric disabilities, the ALJ found he had the residual functional capacity to perform simple, routine light work, as defined in section 404.1567(b) of the regulations, with limited public contact. (*Id.* at 23.) At Steps Four and Five, the ALJ found that Ralston was unable to perform any past relevant work; nonetheless, there were still a significant number of jobs in the national economy that Ralston could perform. (*Id.* at 30.) Ultimately, the ALJ determined that Ralston

8

was not under a disability as defined in the Social Security Act, at any time from November 2, 2002, through March 31, 2006, the last insured date. (*Id.* at 31.)

In reaching his conclusion, the ALJ assigned varying weight to the expert opinions. With regards to Ralston's alleged physical disabilities, the ALJ assigned Dr. Borek "great weight," finding that it was consistent with the medical record as a whole and Dr. Lifrak's opinion. (*Id.* at 29.) Conversely, the ALJ assigned varying degrees of weight to Dr. Lifrak's opinions but disregarded Dr. Lifrak's diagnosis of degenerative joint disease and possible disc damage because: (1) no imaging studies were available to Dr. Lifrak when making these determinations; and (2) given the mild to moderate findings on examination, Dr. Lifrak must have relied heavily on Ralston's subjective reports about his ability to lift. (*Id.* at 29–30.)

With regards to Ralston's alleged psychiatric disability, the ALJ mainly relied on Dr. Raclaw's testimony. The ALJ assigned Dr. Raclaw's opinion "full credit" because: (1) his extrapolation of Ralston's behavior in the August 2005 examination with Dr. Chester was supported by the record as a whole; and (2) Dr. Raclaw's conclusion that Ralston could make an adjustment to work-related activities was supported by his testimony and evidence in the record. (*Id.* at 28.) Moreover, the ALJ assigned "some weight" to Dr. King's opinion. (*Id.* at 29.) Here, the ALJ only considered Dr. King's opinion that Ralston was moderately limited in his concentration, persistence, and pace, and that Ralston retained the ability to perform simple, routine work. (*Id.*) Conversely, the ALJ generally disregarded Dr. Fugate's Mental RFC Assessment. (*Id.* at 29.) The ALJ assigned "some weight" to Dr. Fugate's opinion that Ralston was moderately limited in his concentration, persistence, and pace. (*Id.*) The ALJ, however, assigned "little weight" to the remainder of Dr. Fugate's opinion because of some internal

9

inconsistencies in his identified limitations, inconsistencies with Dr. Raclaw's findings, and the possibility that his opinion was unduly influenced. (*Id.*)

## III. STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle*, 139 F.3d at 393. A fact is material only if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.*; *see also Assaf v. Fields*, 178 F.3d 170, 173-74 (3d Cir. 1999).

This standard does not change merely because there are cross-motions for summary judgment. *Appelmans v. Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

10

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) (citation omitted). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990) (citation omitted).

## B. Reviewing the ALJ

A reviewing court will only reverse the ALJ's decision if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). "Where the ALJ's findings of fact are supported by substantial evidence," the court is "bound by those findings, even if . . . [it] would have decided the factual issue differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). "[S]ubstantial evidence . . . means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Thus, substantial evidence "may be somewhat less than a preponderance of evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). "If there is only a slight preponderance of the evidence on one side or the other, the [ALJ's] finding should be affirmed." *Hanusiewicz v. Bowen*, 678 F. Supp. 474, 476 (D.N.J. 1988).

In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the arguments, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). The inquiry is not whether the reviewing court would have made the same determination, but rather whether the ALJ's conclusion was reasonable. *Richardson*, 402 F.2d at 401; *see Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). ALJ decisions are therefore to be accorded a high level of deference in

review. Even if the court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported by substantial evidence. *Monsour*, 806 F.2d at 1190-91.

An agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. *Fargnoli*, 247 F.3d at 44 n.7 ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 63 (1943))). "The district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings." *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)). In Social Security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV. DISCUSSION

### A. Applicable Statute and Law

The Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See* § 404.1520(a). The process is summarized as follows:

12

1.  If the claimant currently is engaged in substantial gainful employment, she will be found "not disabled."
2.  If the claimant does not suffer from a "severe impairment," she will be found "not disabled."
3.  If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled." Otherwise, she will be found "not disabled."
4.  If the claimant can still perform work she has done in the past ("past relevant work") despite the severe impairment, she will be found "not disabled."
5.  Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not she is capable of performing other work in the national economy. If she is incapable, a finding of disability will be entered. Conversely, if the claimant can perform other work, she will be found "not disabled."

*See Cunningham v. Apfel*, No. 00-693-GMS, 2001 WL 1568708, at *4 (D. Del. Dec. 7, 2001)

(paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a preponderance of the evidence. At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000); *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); *Olsen v. Schweiker*, 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that—(a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity which exists in the national economy. *See* 42 U.S.C. § 423 (d)(1)(A), (2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

13

## B.  Analysis

Ralston asserts the ALJ's decision is flawed on five fronts. (D.I. 17 at 7–20.) First, Ralston avers the administrative record is incomplete and therefore inadequate for judicial review. (*Id.* at 7–9.) Second, Ralston asserts the ALJ improperly relied on the mental health assessment of Dr. Raclaw, the non-examining medical advisor. (*Id.* at 9–13.) Third, Ralston asserts the ALJ did not make a finding as to his date of disability onset. (*Id.* at 13–15.) Fourth, Ralston claims the ALJ's severity finding was legally deficient. (*Id.* at 15–16.) Fifth, and finally, Ralston argues the ALJ's assessment of his physical impairments was legally deficient. (*Id.* at 16–20.)

### 1.  Was the ALJ's Record Complete?

Ralston argues the administrative record is incomplete for three, independent reasons: (1) the record fails to include the mental health evidence the SSA provided to Dr. Chester when it referred Ralston for a disability psychiatric evaluation in August 2005; (2) the record does not include a range of motion chart completed by Dr. Lifrak during the 2005 disability physical examination; and (3) the record fails to include a statement of Dr. Raclaw's professional qualification as required by the SSA's Hearing and Appeals Litigation Manual ("HALLEX"). (D.I. 17 at 7–9; D.I. 21 at 1–3.)

In order for a district court to perform adequate judicial review, the ALJ must sufficiently establish the record to allow the court to properly review his findings. *Pringle v. Astrue*, C.A. No. 08-503-GMS, 2014 WL 2452570, at *14 (D. Del. May 16, 2014). As such, the "ALJ's decision should be 'accompanied by a clear and satisfactory explication of the basis on which it rests.'" *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)); *Smith v. Astrue*, 961 F. Supp. 2d 620, 645 (D. Del. 2013). An incomplete administrative transcript does not, however, warrant automatic reversal: "The test is not whether the Commissioner has provided counsel with everything counsel

14

might desire, but whether the transcript that remains before the court permits meaningful or informed review." *Pokluda v. Colvin*, No. 1:13-cv-335 (GLS/ESH), 2014 WL 1679801, at *5 (N.D. N.Y. Apr. 28, 2014); *see also Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 594 (1980); *Brady v. Apfel*, 41 F. Supp. 2d 659, 668 (E.D. Tex. 1999) ("The touchstone is whether the administrative record that does exist permits meaningful judicial review."). Section 405(g) plainly states that, "[a]s part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based." 42 U.S.C. § 405(g).

### a. *Ralston's Psychiatric History Records*

Ralston argues the court cannot provide adequate judicial review because his psychiatric history records—referenced in Dr. Chester's August 2005 consultative examination report—are not in the administrative record. (D.I. 17 at 7.) As recreated above, Dr. Chester indicates that the medical history section was "gathered from paperwork sent prior to [Ralston's] interview." (D.I. 13 at 334.) The report summarizes a long list of events in Ralston's life related to his alleged mental disability. (*Id.*)

During the hearing on June 24, 2009, Ralston's counsel objected to Dr. Raclaw's testimony because Ralston's psychiatric history records had not been uploaded on the electronic filing system, and therefore it was unlikely that Dr. Raclaw had seen Ralston's medical history.[4] (D.I.

---

[4] Stated in full, Ralston's counsel argued to the ALJ:

> Number one, I have no idea what Dr. Raclaw has seen or not seen. Number two, he's had no opportunity to either evaluate [Ralston] during a hearing. I'm further concerned . . . that there appears to be a number of documents which are still not in the file which are psychiatric records from some of Mr. Ralston's earlier psychiatric hospitalizations. As I noted in the letter to you, I saw them in the paper file. And I would note also that they are referred to extensively in Dr. Chester's report where she talks about reviewing discharge summaries and other documents that were, mental health documents that were sent to her for use in her evaluation. Those are not in the record and I'm sure, or reasonably sure, that Dr. Raclaw has

13 at 35-36.) Nevertheless, the ALJ accepted Dr. Raclaw's testimony and dismissed Ralston's concerns regarding the completeness of the records, noting:

> [Ralston] objected because all of the documentation in the previous file . . . relating to the claimant's previous Title II and Title XVI claim filed on May 11, 2005, was not included in the exhibits entered for the instant case. The undersigned overrules this objection. The undersigned reviewed the exhibits . . . and concludes that they involved a period that is not relevant to the period under review, November 2, 2002 to March 31, 2006, or they are cumulative and do not provide a basis for finding a more favorable outcome in this matter.

(D.I. 13 at 24 n.2.)

In defense of the ALJ's refusal to supplement the record with Ralston's psychiatric history records, the Commissioner argues: (1) "it is not the Commissioner's duty to submit Plaintiff's prior disability files; only the file for his current disability claim"; (2) Ralston already received a final judgment on his previous disability claim, and therefore, those files are closed; (3) the documents supporting Dr. Chester's 2005 psychiatric report do not pertain to the relevant period under review for Ralston's current disability claims, November 2, 2002, through March 31, 2006; and (4) even if the records *were* relevant to the period under review, "because the ALJ specifically considered the report of Dr. Chester, who considered and summarized the evidence from the prior files, the ALJ's consideration of Dr. Chester's report constitutes implicit consideration of the files and provides more than a sufficient basis for the Court to affirm the ALJ's decision." (D.I. 19 at 16.) Based on the facts of this case, the court rejects all four of the Commissioner's arguments.

First, as Ralston correctly points out, the Commissioner's posture appears adversarial. (D.I. 21 at 2.) The regulations advise that adversarial postures should be avoided. 20 C.F.R.

---

not seem them. So there's a number of reasons that I believe that he would not have the background or the knowledge to make an opinion in this case.
(D.I. 13 at 35–36.)

§ 404.900(b) ("In making a determination or decision in [a claimant's] case, we conduct the administrative review process in an informal, nonadversary manner.") The court finds the Commissioner's refusal to include Ralston's psychiatric history records in the administrative record—even though such records are in the Commissioner's possession—to be adversarial in nature and therefore rejects the first argument.

The Commissioner's second argument essentially asks the court to rule that, when a claimant has received a final judgment in a prior disability claim, the medical evidence used in furtherance of that claim has no value in any future claims. The court rejects this argument. The documents in question pertain to Ralston's psychiatric history. Logic dictates that the facts contained within these records might well provide the evidentiary foundation for Ralston's claim for mental health disability benefits.

The Commissioner's third argument misses the point of Ralston's objection. The omission of the psychiatric records is important because the ALJ clearly indicated that he used information within the documents when determining if Ralston had a "severe" impairment at Step Three of the sequential determination process. (D.I. 13 at 21.) Moreover, the ALJ clearly made two conclusions with regard to Ralston's psychiatric history: (1) the documents did not involve a period that is relevant to the period under review; and (2) the documents are cumulative and do not provide a basis for finding a more favorable outcome in Ralston's DIB claim. (D.I. 13 at 24 n.2.) Perhaps this is true, but without access to the documents, the court cannot adequately review the ALJ's determination.

Finally, the Commissioner incorrectly relies on the Third Circuit's decision in *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005). The Commissioner argues that an ALJ's consideration of a medical examination report from someone else "who considered and summarized the evidence

17

from prior files," constitutes implicit consideration of *all* the files and "provides more than a sufficient basis for the Court to affirm the ALJ's decision." (D.I. 19 at 16.) But the case at hand is different from *Rutherford*. Unlike *Rutherford*, where the Third Circuit addressed whether an ALJ need explicitly mention an impairment that was implicitly evident in the complete administrative record, this case deals with the *development* of an administrative record and the court's ability to adequately review the ALJ's findings and conclusions. There is no doubt that the ALJ explicitly mentions Ralston's psychiatric history. (D.I. 13 at 21.) The issue is that the records themselves are not available for the court to review.

Ultimately, the court is persuaded that adequate review of the ALJ's finding—that Ralston did not suffer from a psychiatric disability—is not possible given the current state of the record. As such, the court will remand the matter for inclusion of Ralston's psychiatric history records— the "paperwork" referenced in Dr. Chester's August 2005 opinion in the administrative record.

### b. *Range of Motion Chart*

Second, Ralston argues the record is incomplete because it does not include a range of motion chart completed by Dr. Lifrak during Ralston's 2005 examination. (D.I. 17 at 7.) In response, the Commissioner argues: (1) there is no evidence Dr. Lifrak ever submitted a range of motion chart with his ultimate report; and (2) even if a range of motion chart had been completed, its inclusion would be cumulative and unnecessary. (D.I. 19 at 17.)

Dr. Lifrak's statement—"For details of musculoskeletal examination please see a current range of motion chart"—indicates such a chart existed at some point. (D.I. 13 at 333.) Nevertheless, the court agrees with the Commissioner that, even if a range of motion chart was completed, its inclusion in the administrative record would be cumulative because the results of the range of motion examination are clearly captured in Dr. Lifrak's report. The report states

18

Ralston's "range of motion was reduced in the area of the lumbar spine but there was no evidence of muscle spasm being present." (D.I. 13 at 333.) As such, the administrative record is sufficient regarding Dr. Lifrak's range of motion chart.

### c.   *HALLEX*

Finally, Ralston argues that the administrative record is incomplete because it fails to include a statement of Dr. Raclaw's professional qualifications, thereby violating sections I-2-5-38 and I-2-5-39 of HALLEX. (D.I. 17 at 7.) In response, the Commissioner argues that Ralston was notified that Dr. Raclaw would testify and therefore had an opportunity to question Dr. Raclaw and verify his qualifications during the hearing. (D.I. 19 at 17–18.)

"HALLEX does not carry the force of law. Nor does HALLEX create any judicially-enforceable rights." *Nash v. Astrue*, No. 09-342-RGA-MPT, 2012 WL 3238226, at *15 (D. Del. Aug. 7, 2012) (internal quotation marks, alteration, and footnote omitted) (quoting *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007)); *see also Moore v. Apfel*, 216 F.3d 864, 868–69 (9th Cir. 2000) (characterizing HALLEX manual as strictly an internal document); *Billings v. Colvin*, No. 13-2446-EFM, 2014 WL 5528683, at *3 (D. Kan. Nov. 3, 2014) (discussing non-binding nature of HALLEX provisions). In any event, any prejudice from a perceived HALLEX violation was cured when Ralston was afforded the opportunity to question Dr. Raclaw at the hearing and did so. (D.I. 13 at 39–40.)

### 2.   **Did the ALJ Improperly Rely on the Testimony of Non-Examining Medical Expert Dr. Raclaw?**

Ralston next argues the ALJ improperly assigned Dr. Raclaw "full credit" because he did not see, hear, or consider all of the evidence.[5] (D.I. 17 at 11; D.I. 21 3–5.) In particular, Ralston

---

[5] The parties' briefing engages in a back-and-forth of semantics regarding the meaning of "full credit" versus "controlling weight." (D.I. 17 at 11; D.I. 19 at 21-22.) The court declines to wade into these etymological waters.

avers Dr. Raclaw did not take into account the paperwork underlying Ralston's psychiatric history as summarized in Dr. Chester's report. (D.I. 17 at 10.)

As already stated, Ralston's psychiatric records should have been part of the record. As such, the court finds that the ALJ erred in relying upon Dr. Raclaw's testimony before he had a chance to review Ralston's mental heal history records. The court remands because Dr. Raclaw's testimony was not based on substantial evidence.

### 3. Did the ALJ Err in Determining Onset Disability Date?

Ralston argues that the ALJ breached a duty to determine the onset date of his disability. (D.I. 17 at 13–14.) Because he determined that Ralston was not disabled, the ALJ did not assign an onset date. At its core, Ralston's argument is predicated on the idea that because the SSA granted his application for Supplemental Security Insurance ("SSI") prior to the ALJ's DIB decision, the primary duty of the ALJ, in this case, was only to determine *when* Ralston had become disabled. In light of the court's decision to remand, the court makes no ruling on whether Ralston's argument is correct. On remand, the SSA should examine whether the evidence supporting Ralston's SSI claim also suffices to establish a DIB claim.

### 4. Did the ALJ Err in His Severity Finding When He Did Not Address Ralston's Antisocial Personality Disorder?

Ralston's fourth argument asserts the ALJ erred at Step Two of the sequential evaluation process by not addressing his antisocial personality disorder. (D.I. 17 at 15–16; D.I. 21 at 6–7.) The Commissioner responds that Ralston did not meet his burden to prove that his antisocial personality disorder is a medically severe impairment. (D.I. 19 at 9–12.)

---

The pertinent issue to be decided is not whether Dr. Raclaw was assigned too much weight but, rather, whether Dr. Raclaw's testimony should have been relied on at all given his failure to consider all the records.

At Step Two of the sequential evaluation process, the claimant bears the burden to prove he has a medically severe impairment. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987) ("The claimant first must bear the burden . . . at step two that he has a medically severe impairment or combination of impairments."). The SSA confirms that impairments may be found "not severe" only if it involves a "slight abnormality" that has "no more than a minimal effect" on the claimant's ability to work. SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546–57 (3d Cir. 2003). The Third Circuit applies a *de minimis* inquiry at Step Two—any doubt should be resolved in favor of the claimant. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). Nevertheless, an ALJ's failure to address the severity of an alleged impairment may be harmless, such as when the ALJ fairly takes account of the effects of the putative impairment in the RFC analysis. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007); *Neff v. Astrue*, 875 F. Supp. 2d 411, 424 (D. Del. 2012).

In this case, the ALJ erred by not including Ralston's alleged antisocial personality disorder at Step Two, without further explanation. (D.I. 13 at 20–21.) During the relevant period, Ralston testified that he had become a recluse: living in the woods and surviving on fish and road-kill deer. (*Id.* at 59–60, 80.) Indeed, a central feature of Ralston's disability claim is his alleged mental illness, manifesting as antisocial personality disorder. (D.I. 17 at 2.) Moreover, Dr. Chester's summary of Ralston mental health history identified instances where Ralston's alleged antisocial personality disorder appeared to prevent him from working with others. (D.I. 13 at 334–35.) But, as noted above, a complete assessment of Ralston's antisocial personality disorder history is not possible because the current administrative record is incomplete.

In the ALJ's RFC assessment, he found the Ralston could perform simple routine light work with "limited public contact." (D.I. 13 at 23.) But the ALJ merely phrased the hypothetical

to the Vocational Expert as: "Any jobs would have to be just simple, routine in nature, and shouldn't entail a whole bunch of public contact." (*Id.* at 89.) The Commissioner argues Ralston's alleged impairment was considered by the ALJ because the opinions of Drs. Chester and Raclaw included the effects of the alleged antisocial personality disorder. (D.I. 19 at 12.) Therefore, the Commissioner argues, if there was a mistake, it was merely harmless error. In this case, however, Ralston's alleged antisocial personality disorder is not an impairment that is tangentially related to his disability claim—one that could be subsumed within the assessment of related impairments. Rather, Ralston's antisocial personality disorder is a central feature of his DIB claim. As such, the court is persuaded that Dr. Raclaw's and Dr. Chester's diagnoses of Ralston's allegedly severe antisocial personality disorder impairment required further consideration by the ALJ. Therefore, the court finds the ALJ's decision to find Ralston's diagnosed antisocial personality disorder non-severe, was not based on substantial evidence and requires remand.

### 5. Was the ALJ's Assessment of Ralston's Physical Impairments Flawed Because More Weight Was Given to Dr. Borek (Non-Examining) Than Dr. Lifrak (Examining)?

Ralston finally argues that the ALJ's assessment of his physical limitations was legally deficient. (D.I. 17 at 16-20.) Ralston argues the ALJ's assignment of "great weight" to non-examining State agency physician Dr. Borek, as compared to "some weight" and "little weight" to examining SSA consultant Dr. Lifrak, was improper.

"In determining the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts." *Fletcher v. Colvin*, No. 12–920–SRF, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Section 404.1527 of the Social Security Administration's regulations outlines the procedures for evaluating medical opinion evidence. 20 C.F.R. § 404.1527; *Sherlock v. Astrue*, No. CV 09-260-GMS, 2015 WL 452262, at *5 (D. Del. Jan. 30, 2015). Pursuant to the regulations,

all medical opinions are considered "together with the rest of the relevant evidence . . . receive[d]." § 404.1527(b). All medical opinions are weighed according to a number of factors, taking into account the nature of the relationship between the examiner and the applicant. § 404.1527(c).

The ALJ's assignment of more weight to Dr. Borek is supported by substantial evidence. Dr. Borek's determinations are largely similar to those made by Dr. Lifrak. Moreover, Dr. Lifrak's notations all tend to support Dr. Borek's findings. (D.I. 13 at 332–33.) Consequently, the court rejects Ralston's contention that the ALJ erred in assigning more weight to Dr. Borek than to Dr. Lifrak. The physical component of the ALJ's vocational expert hypothetical was supported by substantial evidence.

## V. CONCLUSION

For the foregoing reasons, the court grants in part Ralston's motion for summary judgment (D.I. 16) and denies the Commissioner's motion for summary judgment. (D.I. 18.) This matter is remanded for additional administrative proceedings.

Dated: March **3 7**, 2015

UNITED STATES DISTRICT JUDGE